Good morning, Your Honor. Jed Wakefield on behalf of Appellant and Cross-Appellee Delphix Corporation. I'd like to reserve three minutes, if I may, for rebuttal. All right. And I plan to start by addressing the issues in our appeal, the specific jurisdiction and then general jurisdiction, and finally turn to the actual controversy issue for declaratory judgment. All right. As the district court correctly found in this case, this case, this dispute is about much more than trademark office proceedings. It's a declaratory judgment case about whether Delphix has the right to use its trademark and its name. And virtually all of the conduct giving rise to this dispute by the defendant occurred in California, right here in San Francisco, including demands that Delphix change its corporate name. Despite that, the district court examined the personal jurisdiction issue as if Delphix had been out of State the whole time and then looked to see whether its conduct had been aimed at the State, ignoring the fact that it was here all along. And this misapplies the standard for specific personal jurisdiction in two really important respects. First, it ignores the rule that for specific jurisdiction, the time for assessing contacts with the State is the time of the suit-related conduct, not the time of the lawsuit. And that's under Steele v. United States. And second, it ignores the traditional and fundamental importance of conduct occurring in the State. The focus, first and foremost, in looking at personal jurisdiction is whether there was in-State conduct giving rise to the claim. And the Supreme Court recently reinforced this point in Bristol-Myers-Squibb, which both parties submitted in a notice of supplemental authorities. In that case, the Supreme Court reiterated that specific personal jurisdiction requires an affiliation between the forum and the underlying controversy, principally an activity or occurrence that takes place in the forum State. So the principle, the main concern, the first thing we look at is in-State conduct. And that Supreme Court case reinforces this Circuit's test in Bancroft v. Masters in looking at minimum contacts, where the first thing, the first prong is whether the defendant has performed some act or consummated some transaction within the forum, or otherwise purposefully availed itself of the privileges of conducting activities in the forum. So this is the first prong of Bancroft v. Masters. I know, but what are you relying upon to assert personal jurisdiction? So here we think there was both the defendant performed acts and consummated transactions in the forum, and that conduct was targeted through the forum and at the forum. Specifically which conduct are you referencing? Sure. So their demands that Delphix change its name, change its marketing materials, those occurred in California through California lawyers. They were the decision-makers at Delphix, I mean at Embarcadero, were here communicating through lawyers who were here in the forum. No one was in Virginia asserting these claims. The people who made the decisions were here. The representatives met in California, not anywhere else. These the positions taken that give rise to this dispute all occurred here. They were in California specifically when they told Delphix that if it wasn't willing to change its corporate name, this dispute was not going to be resolved, and that the current product marketing needed to change. That occurred in California. But don't the cases say the fact that there were negotiations in the State doesn't necessarily confer personal jurisdiction? I think the cases look at whether at the weight of the conduct. So there are cases that note that a single meeting can be significant, including the Xilinx case from the Federal Circuit, coupled with correspondence sent, and those are cases that look at whether someone is outside of the forum when they're deciding to raise the claim. Here they were here. They were asserting rights owned here. The trademark that they were asserting, that they were ostensibly seeking to protect, was owned by a company located in California, licensed to them in California. And a demand that Delphix change its name also affects, or has a potential to affect, its California customers and its relationship with its California customers. A trademark is a designation of goodwill and reputation with one's customers. And Delphix itself, of course, was here. The demands and threats were made to Delphix, which was here. Now, that's not enough under Walden anymore. But it's not irrelevant. And the case that wasn't in our briefs, but we sent in, filled out the form to cite to it, is Axiom Foods, which was a Ninth Circuit case from last month. I apologize for not catching it earlier. But that noted that individualized targeting is not enough on its own, but it remains relevant, even after Walden. So what do you have after the case that says individual targeting is not enough? What is something more that you have? The fact that there was California counsel? Is that the more that you have? So the California counsel were taking instructions, presumably, and representing the interests of decision-makers. The company they were representing was here. The people were here. I thought they had moved to Texas. Not at the time, not for years of these demands. So when they took the position that we had to change our name to resolve this dispute, they were here. And in May of 2015, when Delphix finally said, look, we'll just withdraw our registrations. We can let the trademark office thing go, if you'll just agree that we can use our name. And they said no. That was May 2015. They didn't move out of California until October. At what point was the lawsuit filed? February. February of 2016. And so don't we look at personal jurisdiction as of the time the lawsuit is filed? We don't for specific personal jurisdiction. And this is the United States v. Steele case from the Ninth Circuit. We look at the time of the suit-related conduct, not the time of the lawsuit. And that's, if you're thinking about the policy reasons for that, we're asking whether a party engaging in the conduct at the time would expect to be sued somewhere else. Here, when they're deciding, let's go after these guys' trademark, let's enforce our rights, let's tell them they have to change their name, all that happened, all the actions they took to raise the sword of Damocles over Delphix happened here. It wasn't until shortly before the lawsuit that they moved. And the only conduct that happened there is that they didn't dispel the impression that their earlier conduct in California had conveyed. Counsel, if I could ask you some questions about general jurisdiction. Sure. You just said that for specific jurisdiction, the time of the suit is not the test. It's when the act occurred, which makes sense. If I'm a California citizen and I go to Las Vegas and I punch some — no, sorry, Judge Wildson, I go to Las Vegas and punch somebody, and then I come right back to California, I could still be sued in Nevada even though I had no contacts other than maybe that punch. You said, though, in general jurisdiction, it's at the time of the suit. And I wanted to — this may seem odd, but I wanted to press you on that because it seems to me that for general jurisdiction, it could exist even before the time of the suit if, for example, if Apple did some really bad thing in California and then they quickly shifted all their business to Ireland, I think California would still probably have general jurisdiction even if they moved everything to Ireland the next day and then the lawsuit was filed. Is there a case that says I'm wrong about that? Because you've stuck to time of suit. I looked in your briefs and you didn't argue before then. So maybe I'm missing something here. So I haven't found a case definitively saying that only time of suit is relevant for general jurisdiction. The case law in — seems to look at that as the standard. But I think Your Honor raises a very good point, which is, you know, fundamentally we're concerned with due process. And, you know, is it a due process violation for a company to be sued in a place that was its home and its headquarters for decades when most of the conduct giving rise to the suit occurred during that time? I don't think it would be. But I also want to be clear that I'm not advocating for a hybrid or sliding scale specific personal jurisdiction. That's absolutely not okay after Bristol-Myers Squibb. But I think Your Honor raises a good point on general jurisdiction. And you don't know of any authority that says definitively that my question is wrong? Correct. Okay. I can — a few other points on general jurisdiction unless Judge Rawlinson wants me to go back to specific.  I don't want you to do anything.  So on general jurisdiction, the, you know, the question is whether the affiliations with the State are such that it can — that the party can be essentially at home, deemed to be essentially at home in the forum State. Traditionally, that's the place of incorporation or principle place of business. But where a company designates its principle place of business is not necessarily dispositive. A court can look at what the real contacts are. And the Supreme Court in Daimler recognized that. In this case, there was evidence that although officially, in some — well, in some official respects, Embarcadero had moved. Other evidence showed that they hadn't. And it's not surprising when a company gets acquired, not everything necessarily happens immediately. And we found a lot of evidence, marketing web pages, customer-facing contracts, things indicating that they were headquartered here or based here. There were disputes about how many employees there were. We had evidence showing they had a lot of important employees here. They submitted affidavits disputing that. So if the district court holds an evidentiary hearing, that's a way to resolve  But Embarcadero didn't request an evidentiary hearing. And so we have this record. And under Ninth Circuit authority, where there is a dispute between the parties over statements contained in affidavits, this is under Schwarzenegger, those disputes are resolved in the plaintiff's favor. So I think we win on general jurisdiction, too. There was a dispute in the record with extensive evidence, including judicial admissions, that Austin was not their location at the time. I'd like to turn briefly to declaratory judgment jurisdiction. We think the district court reached the right result but applied the wrong standard. The district court held that the Supreme Court's met immune standard, the all the circumstances actual controversy test, did not apply because this circuit had never applied it in the trademark context. And so the district court applied a reasonable apprehension of litigation test. But nothing in met immune was limited to the patent context. And when the Supreme Court rejected the reasonable apprehension test as being too rigid, the Supreme Court was citing to non-patent cases, including insurance cases. So the all the circumstances test and the rejection of the reasonable apprehension test is the law of the land for declaratory judgment. Under this standard, we clearly have an actual controversy here. In fact, I think even under the more rigid reasonable apprehension test, we would have it. Embarcadero repeatedly insisted on changes to the actual use of the mark. And they now try to characterize this as all being somehow about trademark office proceedings. The trademark office has no jurisdiction over Delphix's name or how it markets its products in commerce. And the record shows that when Delphix was proposing changes to the trademark registration, Embarcadero responded, well, if you're only making proposals about the application language, I don't know how that helps with the real world market situation. They admit in their brief that a fair reading of the evidence demonstrated that Embarcadero insisted on restrictions on use of the mark. This wasn't only about future or abstract hypotheticals. They pointed to the current product. They said as to the current product, it would take major changes in the way the product is marketed and significant limitations on use. There's a real dispute here. The fact that they didn't use the word infringement or say we're going to sue you isn't the test, specific particularly when there's no reasonable apprehension required. But even before, there's no magic words test. We look at all the circumstances. And finally, the duration of the dispute doesn't mean that the case is not ripe. Other courts have found jurisdiction exists after years of dispute. This circuit in Rhodes was four years. Cheeseboro Ponds was three years. The Surefoot case we cited from the Tenth Circuit was six years. So, you know, Delphix is still today faced with a choice. It can either change its name to reduce this risk, or it can, and in doing so, give up very valuable rights, or it can risk future liabilities down the road. As this circuit recognized in the Société de Conditionnement case, this is the very predicament that the Declaratory Judgment Act was created to prevent. And I'd reserve the balance of my time. All right. Thank you, counsel. May it please the Court. My name is Neil Greenstein, and I'm counsel for Embarcadero Technologies. I would like to reserve two minutes for rebuttal on the cross-claim. A very important issue, a very important context that needs to be understood here is the key differences between what the Trademark Trial and Appeal Board can do and what the courts can do. When you look at the current goods and services of what somebody is doing, those current goods and services, whether or not there is an infringement, that's something that a court can look at. To the extent that somebody is seeking a trademark registration, which is broader than what its current goods and services are, it would be an advisory opinion for the courts to get into that issue. Let me give you sort of a physical example of some of the differences. Delphix here, they have a product which, let's say the way they market it, what the product is, the customers that they market to, a very elite set of customers, six-figure costs for these products, may fit right on that bench over there. Whereas their trademark application actually encompasses this whole courtroom. It wouldn't be proper for the court to render an advisory opinion as to all of these expanded goods and services, manners of marketing, sophistication of customers. Yet the Trademark Trial and Appeal Board, in fact, does engage in that because it looks at certain categories of products. And once that registration issues and the registration ultimately becomes incontestable, then Delphix can come in and encompass this whole courtroom, even though Embarcadero may actually already have half of this courtroom taken up. Take a look, for example, at the Wells Fargo case that we cited, the Wells Fargo v. Stagecoach, where it acknowledges that the TTAB rulings have substantive effect on hypothetical future rights. Also, a discussion, settlement discussions that you have in conjunction with the Trademark Trial and Appeal Board, typically, and this is in the record, it typically involves the manner in which people are going to use a trademark because the trademark registrations typically encompass certain categories. It's rare, if ever, that a trademark registration will say, oh, you can only sell this if it exceeds six figures. Or perhaps you look at a piece of software. People used to talk about, oh, we're only going to use it on mainframes. Well, what's a mainframe? You know, that's a historic concept. So typically, when you have somebody who's going to get a registration, who's going to get affirmative rights in the future for hypothetical products, if there's some kind of interface between these companies, then it's very common for people to negotiate for and reach a resolution where there are restrictions on where somebody is going to expand. That's exactly what we have here. What the issue here, Embarcadero has never made infringement allegations against Delphix. The allegations that are here, even if you look at the notice of opposition, it is with respect to the specific goods listed in the registration. Again, the notice of opposition is in the record that's here. Moreover, if you look at the Hogs and Heroes Foundation case that we cited, a discussion in settlement of future uses doesn't rise to the level of a substantial controversy. So, you know, the Ninth Circuit also specifically recognizes that when you're using a trademark, you need to consider what the trade channels are, what the customers are. For example, the AcuRide case that we cited. The Ninth Circuit said, the marketing channels and sophistication of prospective consumers are especially relevant in determining whether any confusion in the marketplace is likely to arise from defendants' adoption of AcuRide. Citing alpha industries, taking into account sophistication of consumers and channels of trade in assessing likelihood of confusion in trademark in a trade name challenge. So those kinds of discussions, the manner in which somebody is going to use it, the types of customers that they're going to sell it to. If one company is at a very high end selling only to CFOs, CMOs, and certain other CIOs, certain other people, because this is a huge cost product, and another company is in the marketplace selling online software that can be downloaded to a broader base to a less sophisticated consumer, then that is certainly an appropriate discussion. Which is not an infringement discussion, but it's an appropriate discussion to make sure that there isn't an expansion by Delphix here to come in and step on the rights of Embarcadero, rights that have been out there for decades. In fact, if you look in the record, and it's in our brief as well, in the settlement discussions, and obviously settlement discussions are very rarely before the court because of the privilege, but in this case they're under the Rhodes case. The settlement discussions are something that were appropriate to bring to the court. And the settlement discussions, the settlement emails, obviously don't go through every single point that one would go through in an informal email that you would go through in a more detailed cease and desist letter, for example. But in the context of these discussions, the email from Martin Greenstein to Delphix, Martin Greenstein and another counsel for Embarcadero, says Embarcadero does not see a way to resolve this without a change in the Delphix corporate name, a very tight agreement against future expansion of the functionality and features of the product, and a very substantial restriction and limitation on how this product is described and marketed to customers. The comments at the meeting and our subsequent exchanges make it clear that Delphix is not prepared to do those things, so we should continue the opposition. There's no threat of any kind of litigation. There's no threat there. What there is, is unless we make sure that with respect to any future products, that these products are limited and don't turn around and traipse on Embarcadero's rights. In fact, Delphix talked about offering to withdraw and try to terminate the proceeding by a withdrawal, and they asked in exchange for an unlimited covenant not to sue. Not just a limited covenant not to sue with respect to their existing products, but Eric Ball, in his declaration at 2ER079, specifically commented about how they were seeking an unlimited covenant not to sue from Embarcadero. If it was only a very limited covenant not to sue, limited to the products, the trade channels, the sophistication of what's out there, something that we have not sued about, either here or in Europe, even though Delphix lost the opposition in Europe, we didn't sue about any of that, of what they have. So they're expanding things here, and they're actually trying to go and have the court look at something more than what's in the registration. That's an important point here because the Federal Circuit in the OCTACOM case that we have cited here, in that case, the underlying case, the Trademark, Trial, and Appeal Board, had looked at the specific products that were listed in the registration and refused to consider the actual products of the parties. The litigant in that case was very upset and said, no, you really need to look at what the products are in that case. So they appealed to the Court of Appeals to the Federal Circuit. What happened? The lawyer got sanctioned for saying, you need to look at the actual products, not what's in the application. Counsel, may I turn your attention to the personal jurisdiction matter for a moment? Sure. Do you agree with opposing counsel that when determining specific personal jurisdiction, that the court looks to the underlying acts that comprise the cause of action at that time, as opposed to the time of the filing of the complaint? Do you agree with that? Well, Your Honor, I think you need to look at it with respect to the time of filing the complaint, but you certainly look at the acts that were undertaken by the parties prior to that time. Now, in that regard, what I would point out to you is that the court is looking at the underlying acts, the acts that were taken prior to the time of the filing of the complaint. Can those acts in and of themselves establish specific personal jurisdiction? Well, here they do not, because they can't. But as a matter of, theoretically, they could establish specific personal jurisdiction. Is that correct? They could establish specific personal jurisdiction. If somebody were in a car accident in California and they were from Nevada, sure, that could establish personal jurisdiction. But here what we have is we have a TTAB proceeding. This is in Virginia. The action that was taken was in Virginia. When you're looking at a declaratory judgment action, we're looking at enforcement of trademark rights. We're not looking at somebody going after somebody who has infringed. It's not that we're turning around and saying, hey, there's an effect in the marketplace here because somebody filed this infringement action. It's not a Calder v. Jones. It's not a Keaton v. Hustler case. But opposing counsel says it has impact on the California application of the use of its name. What's your response? The impact is in the minds of Delphix. In fact, what Delphix did is they filed a trademark application to try to expand their rights. That's the issue that we have. We didn't have a problem with their existing rights. That trademark application trying to expand the rights, we merely filed an opposition to that application. Even if we were 100 percent successful in the opposition, which we feel we will be, Delphix is not going to be precluded from continuing to sell its products. Other than the fact that the proceeding is public, none of its customers would ever hear about it. We are simply talking about an opposition that was filed in Virginia, and this was in response to Delphix's attempt in its filing in Virginia to get nationwide rights. We're simply talking about that proceeding and whether or not they can get the additional rights from a registration to future unknown products. Counsel, there's a case in the Ninth Circuit, Bancroft. I'm familiar with Bancroft. That your briefing did not address. I didn't see the case discussed in your brief. Do you want to discuss why that case doesn't tilt this thing in the favor of the other side? Sure. And I apologize. I thought we did address the Bancroft case, but you could be correct on that. The Bancroft case. I don't count on it. Okay. Again, I apologize. The Bancroft case involved a domain name. It was, in essence, a self-executing procedure where if somebody made the claim with respect to that domain name, then the domain name would be automatically shut down unless there was some action taken by the domain name holder. Now, first, I would point out that I think the Bancroft case is separate and apart from the fact that it is distinguishable, and I will go into that some more, but I'd also point out that I think the Bancroft case may be of questionable use and validity after the Walden and the Squibb cases that have come down recently. But what's important here to look at with Bancroft is that is much more like a Calder v. Jones or a Keaton v. Hustler. That is, in Calder v. Jones, you had a publication where there were a whole bunch of people in the state seeing that publication, and this is an important distinction in the Walden case because it needs to affect the state, not just a particular person. Similarly, in the Hustler, the Keaton-Hustler case, that was a publication that affected people, not just the owner there, but it affected a whole bunch of people in the state, and it was, in essence, published there. Similarly, in the Bancroft case, what happened is that there was the potential shutting down of the domain name. That's something that would have had a tremendous effect in the state there. So in that sense, those are very different from challenging somebody who's merely trying to get an expansion of their rights by filing a trademark application in Virginia. So with that, I see that I am out of time here because of the reservation, and I will turn this over. Thank you. Thank you, counsel. Rebuttal on the direct appeal? On the direct appeal? Yeah, your appeal. Right. So on specific personal jurisdiction, the notion that all of this is about a trademark office proceeding directed only at Virginia is just not borne out by the record. Because we look at declaratory judgment through the reasonable perceptions of the plaintiff, when you look at communications saying you have to change your current products and you have to change your name to resolve this dispute, it's reasonable to infer that there is a dispute with our current product. Those communications happened here, not in Virginia. They weren't about Virginia. The trademark office has no authority over our current use of our name and no authority over the name of the company. All right. Did you want to make any final arguments about the subject matter jurisdiction issue? Sure. And I've sort of melded them a bit because understanding the scope of the case determines what the suit-related conduct is. But, you know, I would cite back to Cheeseboro Ponds. There you had a letter declaring an intent to file opposition proceedings. No actual proceedings underway. And because it relied on likelihood of confusion, that was enough to create an actual controversy about use in commerce, because the plaintiff in that case actually used the mark. Here we had a challenge at the trademark office, not just to an application, but a cancellation proceeding to strip away a trademark registration that we own that covers our existing goods and services, and much more demands that we change our name. And under those circumstances, that clearly creates an actual controversy that is not hypothetical. It's not an advisory opinion. It's a real dispute, and it happened here. All right. Thank you, counsel. Thank you, Your Honor. Okay. Rebuttal on the Cross Appeal. Yes, Your Honor. Just one comment here. Counsel talked about the trademark registration and the attempt to cancel that and the stripping away of rights. Again, that trademark registration was for broader goods than what they were actually using the mark on at the time that we were going through this whole process. It was a registration that was too broad. If we go back to the trademark office, which we anticipate that at some point we will be, if there's no resolution, then yes, we believe that registration should properly be canceled. Will Delfix be prohibited from filing a narrower registration for that mark? That's not going to be a race judicata. There may be other issues. We don't know. But they certainly can seek it for different goods and services. What we're looking at here and what the Trademark Trial and Appeal Board will be looking at is the list of goods and services in the application and in the registration. If the court doesn't have any further questions, I'm completed here. Thank you. It appears not. Thank you, counsel. Thank you to both counsel for your helpful arguments in this case. The case just argued is submitted for decision by the court. The final case on calendar, Lenovas v. Twines, has been deferred. That completes our calendar for the morning. We are on recess until 9 a.m. tomorrow morning.
judges: Rawlinson, Owens, Rice